In re **BAILEY PONTIAC, INC.**, Debtor.

**DINKEL ENTERPRISES, INC., d/b/a Billings Auto Auction, Appellant,**

v.

**Joseph COLVIN, Trustee for Bailey Pontiac, Inc., Appellee.**

**Civ. A. No. 4–92–084–A.**

United States District Court, N.D. Texas, Fort Worth Division.

April 21, 1992.

Joseph Wesley Colvin, Gilbert & Colvin, Fort Worth, Tex., for debtor and appellee.

Woodrow Michael Bonesio, Catherine E. Bracken, Akin Gump Hauer & Feld, Dallas, Tex., for appellant.

## MEMORANDUM OPINION AND ORDER

McBRYDE, District Judge.

This action comes before the court as an appeal from a judgment rendered by the United States Bankruptcy Court, Northern District of Texas, Fort Worth Division, the Honorable Massie Tillman presiding. The court, having reviewed the briefs of appellant, Dinkel Enterprises, Inc., d/b/a Billings Auto Auction, and appellee, Joseph Colvin, Trustee for Bailey Pontiac, Inc., the record on appeal and applicable authorities, makes the following determinations:

## I.

### *Jurisdiction*

This is an appeal from a judgment rendered in Adversary No. 490–4243 under Case No. 490–43545–MT–11. This court's jurisdiction exists pursuant to 28 U.S.C. § 158(a).

## II.

### *Underlying Facts and Proceedings*

The evidentiary facts giving rise to the adversary proceeding are undisputed. The following summary is taken from the bankruptcy court's findings of fact entered December 4, 1991, from appellant's statement of the case, and from the record.

Appellant runs an auto auction in Billings, Montana. In October 1990, appellant conducted an auction of late model General Motors ("GM") cars. The cars had been designated by GM for sale and, at the time of the auction, GM had title to the cars. Pursuant to custom, two days after the auction, GM drafted on appellant for payment of all the cars sold at the auction and delivered to appellant the titles for the cars.

Bailey Pontiac, Inc. ("debtor") attended the auction through its authorized agent, Neil Sanker, who was a friend and business acquaintance of Ron Dinkel, co-owner of appellant. The two had known each other for approximately two years and Sanker had attended other auctions on behalf of another dealer. Debtor was a successful bidder on twenty automobiles at the auction. Debtor, through Sanker, executed and delivered to appellant bank drafts for payment of the vehicles. Debtor was then allowed to take the cars from appellant's lot and have them transported to Texas.

Upon receiving the car titles from GM, appellant put the titles into the corresponding draft envelopes and delivered them to its bank in Montana to be forwarded to the appropriate banks for payment. Ten of the drafts were returned unpaid. Dinkel contacted Sanker, who advised him to resubmit the drafts. Appellant did so, but almost immediately thereafter debtor filed its petition in bankruptcy. Appellant never received payment for the ten vehicles.

Appellant filed a complaint for declaratory relief requesting the bankruptcy court to determine the estate's interest in the ten vehicles for which appellant had not been paid. The complaint was docketed as an adversary proceeding. The trial was held on October 24, 1991. On December 3, 1991, the bankruptcy court signed its findings of fact and conclusions of law and an order denying the relief sought by appellant. These items were docketed on December 4, 1991.

### III.

#### The Bankruptcy Court's Conclusions of Law

As stated, the parties do not contest the bankruptcy court's findings of fact. The conclusions of law under attack by appellant are:

#### IV.

[Appellant] accepted Debtor's bank drafts and allowed the cars to be delivered to Debtor's place of business before the drafts cleared the banks. The acceptance by [appellant] of Debtor's bid created an executory contract which is governed by the provisions of the Uniform Commercial Code as adopted by the respective state. (citations omitted). [Appellant's] remedies are delineated under the Montana Code sections that govern sales. (citation omitted).

#### V.

The twenty cars are property of the bankruptcy estate. Because [appellant] has no security interest in the automobiles, [appellant] is an unsecured creditor of the Debtor.

#### IV.

#### Issues on Appeal

Appellant's issues are presented in the form of statements, to wit:

(1) According to the course of dealing between the parties and the custom and usage in the trade of the auto auction industry, ownership in the vehicles could not pass until [appellant] was paid in good funds.

(2) Title to the vehicles did not transfer at the time of delivery due to the explicit agreement between [debtor] and [appellant] that title would not pass until [appellant] had received good funds.

(3) The vehicles and the proceeds from their sale were and are held by [appellee] in express or constructive trust for [appellant] such that they were never property of the debtor's estate under § 541 of the Bankruptcy Code due to the express or implied agreement of the parties, or alternatively, due to debtor's fraudulent conduct.

(4) The purported sale of the vehicles from [appellant] to [debtor] was void for failure to comply with the Texas Certificate of Title Act such that title to the vehicles and the proceeds from their sale never became the property of debtor.

(5) [Appellant] is entitled to a declaratory judgment that it recover the vehicles or the proceeds from the sale thereof, and that it recover its reasonable

attorney's fees and costs to be paid from the estate of the debtor.

## V.

### Standard of Review

To the extent the appeal presents questions of law, the bankruptcy court's judgment is subject to *de novo* review. *Pierson & Gaylen v. Creel & Atwood (In re Consolidated Bancshares, Inc.)*, 785 F.2d 1249, 1252 (5th Cir.1986). Findings of fact, however, will not be set aside unless clearly erroneous. *Memphis–Shelby County Airport Authority v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 783 F.2d 1283, 1287 (5th Cir.1986). A finding is clearly erroneous, although there is evidence to support it, when the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Id.* The mere fact that this court would have weighed the evidence differently if sitting as the trier of fact is not sufficient to set aside the bankruptcy court's order if that court's account of the evidence is plausible in light of the record viewed in its entirety. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985).

## VI.

### Governing Law

■ The first issue is which state's law should govern the determination of the parties' rights in the vehicles the subject of this action. A federal court must follow the choice of law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 491, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Stuart v. Spademan*, 772 F.2d 1185, 1195 (5th Cir.1985). Texas has adopted the test of the *Restatement (Second) of Conflict of Laws* pursuant to which the law of the state with the most

significant relationship to the particular substantive issue will be applied to resolve that issue. *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex.1984). Among the factors considered are the place of contracting, the place of negotiation of the contract, the place of performance of the contract, and the residence of the parties to the transaction. *McClure v. Duggan*, 674 F.Supp. 211, 215 (N.D.Tex.1987).

Presumably, the bankruptcy court followed the foregoing principles in determining to apply Montana law. Appellant is a Montana corporation [1], which is doing business in Billings, Montana. Debtor sent Sanker to appellant's place of business in Montana to bid on the vehicles. The auction took place in Montana. Debtor delivered its drafts to appellant there, where appellant deposited them with its bank.

The court recognizes, as the bankruptcy court apparently did [2], that Texas also has a significant relationship with the transaction in question. Debtor resided and did business in Texas. The vehicles in question were shipped from Montana to Texas, where appellant understood they would be sold, perhaps even before title could be transferred to debtor. The drafts were to be paid by debtor in Texas, where the titles to the vehicles would be released to debtor upon payment. Further, Texas is the situs of the vehicles and the bankruptcy proceeding.

■ The pertinent Uniform Commercial Code provisions are identical in Montana and Texas. Neither party to this appeal has demonstrated that a different result would obtain depending upon which state's law is applied. In both Texas and Montana, the Uniform Commercial Code controls to the extent that there is a conflict between it and their respective certificate of title statutes. Tex.Rev.Civ.Stat.Ann. art. 6687–1, § 65 (Vernon 1977) [3]; *Safeco*

---

1. Affidavit of Ron Dinkel in support of plaintiff's motion for summary judgment, attached as Exhibit 15 to the deposition of Ron Dinkel, which is trial exhibit 16.

2. The bankruptcy court cites both Texas and Montana law in support of its conclusions of law.

3. The historical notes to article 6687–1 indicate that § 65 was added by the 62nd Legislature in 1971, presumably after the case cited by appel-

*Ins. Co. v. Lapp,* 215 Mont. 196, 199, 695 P.2d 1310, 1312 (1985). Therefore, the choice of law issue is really a nonissue.

## VII.

### *The Auto Auction Industry*

The Uniform Commercial Code (the "Code") provides:

> Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place....

Mont.Code Ann. § 30–2–401(2) (1991); Tex. Bus. & Com.Code Ann. § 2.401(b) (Vernon 1968). The Code further provides:

> A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts....

Mont.Code Ann. § 30–1–205(2) (1991); Tex. Bus. & Com.Code Ann. § 1.205(b) (Vernon 1968).

■ Trade usage is regularly used and accepted to supplement contracts. For example, a buyer and seller may control passage of title as between themselves by custom and usage in the trade. *Goodpasture, Inc. v. M/V Pollux,* 688 F.2d 1003, 1006 (5th Cir.1982), *cert. denied* 460 U.S. 1084, 103 S.Ct. 1775, 76 L.Ed.2d 347 (1983). If custom and usage call for ownership to pass only after payment and the contracting parties expressly agree to this arrangement, ownership will not pass until payment is made.[4] *Id.*

Appellant argues that pursuant to industry custom, title to an auctioned vehicle does not pass and the sale is not complete until good funds have been paid for the vehicle. In this case, however, there is no evidence that the parties "explicitly agreed" that title would pass only after payment for the vehicle, *i.e.* that usage of trade would be observed. If, indeed, there was an agreement between appellant and debtor, that agreement was implied. Both Dinkel and Sanker testified that there was no oral agreement; rather, the agreement, if any, was "understood."[5]

■ Even if it could be said that the parties had explicitly agreed that title would pass according to trade usage, the bankruptcy court could have reasonably concluded that the custom and practice of the auction industry is that title passes at the time of delivery of the vehicles. Aside from several conclusory statements made by the three main witnesses at trial[6], the record does not otherwise support appellant's position with regard to trade usage. Accordingly, the vehicles are part of the

---

lant, *Phil Phillips Ford, Inc. v. St. Paul Fire & Marine Ins. Co.,* 465 S.W.2d 933 (Tex.1971), was decided. Accordingly, there is no need to address appellant's argument regarding compliance with the Texas certificate of title act.

**4.** This would appear to be a correct reading of *Goodpasture,* which specifically distinguishes the case as being one involving only a buyer and seller "with an explicit agreement regarding passage of title." 688 F.2d at 1006, n. 3. Even if the court's interpretation of *Goodpasture* is incorrect and the Fifth Circuit actually meant that "explicit" also means "implicit," the court's ruling in this case would be the same for the reasons discussed in this section VII.

**5.** Lest there be any doubt as to the distinction between explicit and implicit, "explicit" is defined as "characterized by full clear expression: being without vagueness or ambiguity: leaving nothing implied." *Webster's Third New Interna-*

*tional Dictionary* 801 (1966). "Implicit", on the other hand, means "capable of being understood from something else though unexpressed: capable of being inferred." *Id.* at 1135. Although the Code does not define the term "explicit", courts have given the term its ordinary meaning. *See Bowman v. American Home Assurance Co.,* 190 Neb. 810, 213 N.W.2d 446 (1973). *See also* U.C.C. § 1–205, comment 3 (1977) (recognizing that a course of dealing may enter an agreement either by explicit provisions of the agreement or by tacit recognition).

**6.** *E.g.,* appellant's brief refers to Sanker's answer of "sure" when asked if he had an explicit agreement with appellant regarding passage of title. Appellant's Brief at 6. An examination of the question and answer in context reveals that there was not an explicit agreement at all.

bankruptcy estate and appellant has no interest in them. The testimony shows that: payment for auctioned cars could be by cash, GMAC financing, or draft; as soon as debtor signed and delivered the drafts, appellant released the cars to debtor; appellant lost physical control over the cars when it released them to debtor; appellant understood that debtor, like other auction purchasers, would be operating on a float, *i.e.* debtor could sell the cars it bought at auction before paying for them; appellant could have held the cars until the drafts cleared but chose not to do so; and, at the time debtor sold the cars, debtor believed that it owned them because they had been paid for by draft. The bottom line was best expressed by appellant's expert, Barry Roop:

> ... It's a matter of dollars and cents. The manufacturers want somebody else to own the cars. The dealers would like to buy the cars at auction, get the car home and sell it before the draft hits so that they can be operating on somebody else's money. It's a very common practice.

Tr. at 101.

### VIII.

#### *The Fall of the Hammer*

■ Neither party discusses on appeal the bankruptcy court's reference to the Code provision regarding auctions,[7] to wit: "A sale [by auction] is complete when the auctioneer so announces by the fall of the hammer or in other customary manner." Mont.Code Ann. § 30–11–502 (1991); Tex. Bus. & Com.Code Ann. § 2.328(b) (Vernon 1977). Conclusions of Law No. II. Nor do the parties discuss the cases cited by the bankruptcy court in support of Conclusion of Law No. IV.

Conclusions of Law Nos. II and IV reflect that the bankruptcy court concluded that the fall of the hammer created an executory contract between appellant and debtor, pursuant to which debtor had only to pay for the vehicles. *Bullock v. Joe*

*Bailey Auction Co.*, 580 P.2d 225 (Utah 1978). Further, the bankruptcy court obviously determined that the seller, in its discretion, "[waived] the terms of the auction sale by not insisting upon a compliance therewith [*i.e.* immediate payment in exchange for title,] by the buyer." *Standard Fed. Sav. & Loan Ass'n v. Community Inv. Assocs. I (In re Community Inv. Assocs. I)*, 14 B.R. 211, 213 (Bankr.E.D.Va. 1981). These conclusions alone are sufficient to support the bankruptcy court's judgment.

### IX.

#### *Constructive Trust*

■ As an alternate ground for reversal of the bankruptcy court's judgment, appellant asserts that the bankruptcy court should have imposed a constructive trust in this case. A constructive trust is an equitable remedy that should not be imposed cavalierly, especially in the context of a bankruptcy proceeding. *Neochem Corp. v. Behring Int'l, Inc. (In re Behring Int'l, Inc.)*, 61 B.R. 896, 902 (Bankr.N.D.Tex. 1986). The elements that must be proved before a constructive trust will be impressed are:

> (1) Breach of a long-standing fiduciary duty or actual fraud;
> (2) Unjust enrichment of the wrongdoer; and
> (3) Tracing to an identifiable res.

*Continental Casualty Co. v. Kellogg (In re Chanel Finance, Inc.)*, 102 B.R. 549, 551 (Bankr.N.D.Tex.1988).

■ Appellant first argues that there was a fiduciary relationship between it and debtor because of the relationship between Dinkel and Sanker. The required relationship, however, must be between the parties to the agreement. *Harris v. Sentry Title Co.*, 727 F.2d 1368, 1370 (5th Cir.), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984). Here, the record reflects that the auction at issue was only the first or second attended by debtor and

---

**7.** Appellant simply states that to the extent the bankruptcy court found that ownership passed upon fall of the hammer at auction, such find-

ing was clearly erroneous and not supported by any evidence whatsoever. Appellant's Brief at 5.

there is no evidence of any other relationship between debtor and appellant.

Alternatively, appellant argues that actual fraud has been established because debtor knew it could not pay the drafts when they were issued. The elements of fraud are:

(1) A material representation;

(2) That it was false;

(3) When the speaker made it, he knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion;

(4) The statement was made with the intention that it should be acted upon by the other party;

(5) The other party acted in reliance upon it; and

(6) The other party thereby suffered injury.

*Meyers v. Moody,* 693 F.2d 1196, 1214 (5th Cir.1982).

■ A promise to do something in the future does not constitute actionable fraud unless at the moment the promise was made the promisor did not intend to perform. *Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 434 (Tex.1986). Mere failure to perform is not evidence of intent not to perform. *Dodson v. Kung,* 717 S.W.2d 385, 389 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.). Further, circumstances that constitute nothing more than everyday business transactions do not constitute proof of fraud. *Fun Time Centers, Inc. v. Continental Nat'l Bank,* 517 S.W.2d 877, 883 (Tex.Civ.App.—Tyler 1974, writ ref'd n.r.e.).

■ Here, the bankruptcy court did not find any actual fraud on debtor's part. The record is consistent with this nonfinding. Debtor's agent, Sanker, testified that he thought the drafts were good when they were issued and that, at the time debtor sold the cars, debtor believed that it owned them. The only evidence of fraudulent intent was appellee's speculation that he didn't think "anyone knew the magnitude of the problem." Tr. at 148. This statement would not have supported a finding of actual fraud.

## X.

### *Attorneys' Fees*

■ The final issue on appeal is whether appellant is entitled to recover its reasonable and necessary attorneys' fees. Plaintiff's amended complaint to determine interest in property sought recovery of fees and costs pursuant to Tex.Rev.Civ. Stat.Ann. § 37.009 (Vernon 1986). The bankruptcy court did not reach this issue, since it found in favor of appellee.

Although this court, likewise, need not reach this issue, the court questions whether attorneys' fees would have been available even had appellant prevailed. The Texas Declaratory Judgment Act, codified at Tex.Civ.Prac. & Rem.Code §§ 37.001–.011 (Vernon 1986 and Supp.1992), is remedial in nature and procedural in character. *Lund v. Alanis,* 381 S.W.2d 955, 956 (Tex. Civ.App.—San Antonio), *writ dism'd,* 384 S.W.2d 123 (Tex.1964). Because the adversary proceeding is an action brought in federal court pursuant to 28 U.S.C. § 1334, federal rules and statutes regarding procedure apply. Accordingly, the action should have been brought pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, which does not provide for an award of attorneys' fees in a case such as this. *Mercantile Nat'l Bank v. Bradford Trust Co.,* 850 F.2d 215, 218 (5th Cir.1988).

### ORDER

The court ORDERS, ADJUDGES and DECREES that the judgment of the bankruptcy court from which appeal is taken be, and is hereby, AFFIRMED.